UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BRIAN COCHRAN and JOHN HELBLIG, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.  ) | CIVIL NO. 1:05-CV-249-TLS |
| ) | |
| CITY OF HUNTINGTON and MAYOR ) | |
| TERRY ABBETT, ) | |
| ) | |
| Defendants. ) | |

**OPINION**

Plaintiff Brian Cochran filed his Complaint on July 22, 2005, and on October 24, 2005, the Complaint was amended to include Plaintiff John Helblig. The Plaintiffs allege that the City of Huntington and Mayor Terry Abbett retaliated against them for their political activities by not recalling or rehiring them after they were terminated.

Before the Court is the Defendants' Motion for Summary Judgment, filed on April 21, 2005. The Plaintiffs responded on June 20, 2006, and the Defendants replied on June 30, 2006. For the reasons stated below, the Defendants' motion for summary judgment is denied.

**A.      Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation

marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of

Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**B.     Factual Background**

Resolving all doubts to favor the Plaintiffs, and construing the facts in a light most favorable to the Plaintiffs, the following facts are taken as true for the purpose of deciding the Defendants'

motion for summary judgment.

The city of Huntington hired Plaintiff John Helblig in September 1999 and Plaintiff Brian Cochran in October 1999. Helblig was hired to work in the street department. His duties included picking up trash, driving a dump truck, and plowing snow. Cochran was hired for the position of an entry level garbage man, and in 2000, was moved to work in the water plant. His duties there were to wash filters, run tests, watch computer read-outs, clean the facilities, and do other minor chores. The positions were entry positions, the only requirements for which were a G.E.D. and a drug test. Cochran's and Helblig's positions were covered by a contract with the Teamsters Union. The city employed about 175 full time employees at the time, and about 75 to 80 of them were covered by the Teamsters contract. (Hacker Dep. 33, DE 54-5.)

Defendant Terry Abbett was elected Mayor of Huntington in 2000. In May 2003, a primary election was held between Abbett and challenger Paul Tellef. Abbett defeated Tellef by a substantial margin. In November 2003, Abbett was reelected.

Abbett knew that there were city employees who were supporting Tellef in the primary. He expected city employees to support his reelection since they worked for him. He believed Kenny Martin, Jerry Grover, David Spencer, John Helblig, and Brian Cochran supported Tellef in the primary. He believed Spencer, Grover, and Martin were going door to door in support of Tellef. He thought Cochran was supporting Tellef because several people told him so. Abbett also stated he was aware that Brian Cochran's father, Barry Cochran, was a supporter of Tellef.[1] Barry Cochran

---

[1] Barry Cochran submitted an affidavit setting forth his dealings with Abbett during the 2003 primary election. He states he was the Director of Police at Huntington University and depended on the Huntington Police Department for training. On the night of the primary, he told Chief of Police Terry Stoffel, who was appointed by Abbett, that he supported Tellef's campaign. Stoffel then told Barry Cochran that his job at Huntington College depended on the training with city police department and that could end. Later that night, Barry Cochran attempted to attend the third shift squad meeting as was his usual practice. He was told that he could not enter the police

4

was a former Huntington Police Chief who assisted Tellef's campaign against Abbett. Abbett believed Helblig supported Tellef because he knew Helblig had a sign in his yard supporting Tellef.

On November 5, 2003, the day after the November 2003 general election, Abbett laid off the six members of the city's Teamster employees with the least seniority, including Helblig and Cochran. The purpose of the lay-off, according to Abbett, was to cut costs and save money on insurance. The employees were told that the reduction in workforce was effectively permanent.

The Teamster contract defined a layoff as "the separation of employees from the active work force due to lack of work or funds or to abolition of positions because of changes in organization or any other reason within the discretionary powers of the City." (Teamsters Agreement 18, Pl. Ex. 20, DE 61-12.) When union employees were laid-off, for the next 12 months, the city was required to recall the laid-off employees by seniority before hiring anybody else. The contract stated:

> The City shall not employ any part-time, temporary, or summer help employees if any employees are on lay-off status except for positions that require specific skills not available among employees on lay-off status or where all qualified employees on lay-off refuse recall. The City has no obligation to recall employees after a continuous interruption in employment with the City for twelve (12) months or after an employee refuses recall.

(*Id.* at 19.)

Helblig, Cochran, and other laid-off employees met with their union representative to see if anything could be done about the layoffs. The union representative said he would meet with the Mayor, but it is unclear if the meeting ever took place, and the union took no action.

Shortly after being laid off, Helblig talked to Abbett. Helblig asked Abbett whether he had done anything wrong that led to his being laid off. Abbett said that Helblig had done nothing wrong

---

department building so he left. The next day he attempted to attend an informational meeting put on by the county prosecutor's office at the City Building. He was told by Abbett's assistant to leave the building, but Barry Cochran refused to leave. For his part, Abbett denied that his belief that Brian Cochran supported Tellef was based on his knowledge that Brian's father Barry Cochran supported Tellef.

5

and had just gotten "caught up" in the cost-cutting. (Helblig Dep. 40, DE 54-3.) Abbett also stated that if he had a choice Helblig would have been retained and others would have been let go. Because of this conversation, Helblig thought there was no animosity between them.

In October 2004, Cochran attempted to reapply with the City, but was told that the City was not accepting applications, and to watch the paper for the City's hiring ads. On October 20, 2004, within a week of Cochran's attempt to reapply with the city, the city placed an advertisement in a local paper for seasonal help. Abbett stated that the city had been intentionally waiting to hire until one year had passed from the date of the termination of the six union employees so that the laid-off teamsters would not have to be recalled. Abbett believed the city was permitted to advertise for job openings before one year had passed, so long as nobody was actually hired until after the expiration of the recall rights of the laid-off teamsters.

When Cochran saw the advertisement, he returned to the Mayor's office to reapply. Abbett's secretary told Cochran that Abbett wanted to speak to him and so Cochran went to Abbett's office. Abbett asked Cochran why he wanted to work for the city when he had been so unhappy before. Abbett indicated that he thought Cochran was unhappy working for the city because he thought Cochran had a sign in his yard supporting Tellef during the 2003 primary. Cochran responded that he had been happy working for the city and that he had no sign in his yard. Abbett said that he had bad information. Cochran left his application with Abbett's secretary. Cochran stated at his deposition that his neighbor had a sign in his yard.

John Helblig also reapplied for a position with the city in October 2004. He asked Abbett's secretary for an application. Abbett came to the doorway and said to Helblig, "You know, I wasn't even going to let you fill one out." (Helblig Dep. 38, DE 61-15.) Helblig and Abbett sat down in

6

Abbett's office, and Abbett asked why Helblig would want to work for Abbett. Helblig responded that he did not know what Abbett meant, and asked what Abbett was talking about. Abbett then asked, "What about the sign you had in your yard for two months?" (*Id.*) Helblig explained that he allowed a friend to put a sign in his yard supporting Tellef in the 2003 primary and that it did not mean he actually supported Tellef. Abbett responded by saying, "Well, you know my dad always told me don't bite the hand that feeds you," and that "[y]ou'll never work in the street department again." (*Id.*) Helblig filled out an application and Abbett accepted it.

According to Abbett, he takes all job applications, and at the time Helblig and Cochran applied, he kept applications in his desk. Applications were discarded if he did not feel that the applicant was qualified or was someone he did not want to hire. Abbett stated he did not keep Cochran's or Helblig's applications on file after November 2004.

Neither Cochran nor Helblig was offered a job. Abbett stated that one year after their termination, he did not need to recall the laid-off employees, and could hire anybody he wanted. Abbett stated that though the city needed employees and Cochran and Helblig were experienced, he did not want to hire them. He said he had "no reason" for not wanting to hire Cochran or Helblig, and that it was "just [his] decision" not to hire them. (Abbett Dep. 12–13, DE 61-13.)

On October 28, 2004, Anthony Godfroy applied for a position in the street department. On November 8, 2004, two days after the expiration of the laid-off union employees' recall rights, Godfroy was hired to work a Teamster position in the street department. Godfroy had no qualifications and was hired to work on the garbage truck. According to Abbett, Godfroy was Helblig's replacement. On November 15, 2004, the city hired Phillip Hall and Barry Dean to work Teamster positions; Hall took a job in the street department and Dean took a job at the water plant.

7

When asked what Dean's qualifications were to work at the water plant, Abbett stated, "Absolutely none." (Abbett Dep. 35, DE 61-13.) Abbett said that he did not know whom the employees hired after October 2004 supported in the 2003 primary.

**C.      Analysis**

The Plaintiffs do not argue that the Defendants retaliated against them by laying them off; rather, they argue they were retaliated against by not being rehired or recalled. Also not at issue is whether the city violated its contract with the Teamsters. The only issue is whether the Defendants retaliated against the Plaintiffs by not recalling or rehiring them.

**1.      *Standard for Section 1983 Claims Alleging Retaliation Due to Exercise of First Amendment Rights***

The Constitution prohibits government bodies from retaliating against government employees for exercising their First Amendment rights, including the rights to free speech and political association. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). A person whose constitutional rights were violated has Title 42 U.S.C. § 1983 makes liable persons who act under color of state law to deprive citizens of their Constitutional rights. 42 U.S.C. § 1983. A three-step analysis applies to § 1983 claims by public employees for retaliation in violation of First Amendment Rights:

> First, we must determine whether the employee's speech was constitutionally protected. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech.

*Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004).

The Defendants concede for purposes of summary judgment that the first prong is satisfied,

that is, that the Plaintiffs' political activities were protected.[2] Therefore, the Court limits its analysis to the second and third prongs, which are contested. At issue is whether there is a causal link between the Plaintiffs' political activities and Abbett's refusal to hire or recall the Plaintiffs. There is a material issue of fact as to the existence of a causal link if the Plaintiffs can show that Abbett's decision was substantially motivated by the Plaintiffs' political activities and if the Defendants fail to show that the Abbett would not have hired the Plaintiffs apart from their political activities. The analysis of these issues is the same as the analysis for a Title VII retaliation claim. *Spiegla*, 371 F.3d at 943 n.10; *Mitchell v. Randolph*, 155 F. Supp. 2d 1057, 1066 (N.D. Ind. 2001).

a.   *Whether Abbett's Decision Not to Recall or Rehire the Plaintiffs Was Motivated by Their Speech*

The Plaintiffs have the burden of showing by the preponderance of the evidence that they were not hired or recalled in substantial part because of their political activities. *Spiegla*, 371 F.3d at 942. This may be established for purposes of summary judgment by either the direct method or the indirect method. The direct method looks to whether the plaintiff has submitted evidence sufficient for a reasonable jury to find that the retaliatory action was taken because of the plaintiff's protected conduct. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Because the Court finds that the Plaintiffs survive summary judgment on the direct method, the indirect method need not be considered.

The Plaintiffs have both direct evidence and circumstantial evidence of retaliation sufficient for a reasonable jury to conclude they were not recalled or hired because of their political activities.

---

[2]The Defendants make no issue of the fact that Cochran did not support anybody in the 2003 primary election and had no sign in his yard supporting Tellef.

Direct evidence consists of evidence which in and of itself suggests that the adverse employment decision was motivated by an impermissible criterion. *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 394 (7th Cir. 2005). Statements by the decisionmaker about his motivation fall within this category. Circumstantial evidence acceptable to show retaliation includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Walker*, 410 F.3d at 394 (quoting *Troupe*, 20 F.3d at 736). Such evidence is examined by looking to the totality of the evidence and whether, taken as a whole, it composes a "'convincing mosaic of discrimination against the plaintiff.'" *Id.* In other words,

> [a] case of discrimination can [] be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction: "a number of weak proofs can add up to a strong proof."

*Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (quoting *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004)).

Helblig has direct evidence showing Abbett was motivated by the fact Helblig had a sign in his yard supporting Tellef. According to Helblig's testimony, after applying for a job with the city, Abbett said he was not inclined to let Helblig fill out an application because he had a sign in his yard supporting Tellef in the 2003 primary. He then told Helblig "don't bite the hand that feeds you" and "you'll never work in the street department again." (Helblig Dep. 38, DE 61-15.) If a jury believes Helblig's account, they could reasonably conclude that Abbett refused to hire or recall Helblig for the reasons allegedly stated by Abbett: by supporting Tellef, Helblig bit the hand that fed him.

Helblig's testimony is also strong circumstantial evidence supporting the inference that

10

Cochran was also not recalled or hired because of his political affiliations. Abbett told Cochran he was surprised Cochran was applying to work with the city because he had supported Tellef. Abbett then said that he believed Cochran supported Tellef because he thought Cochran had a sign in his yard supporting Tellef. Cochran said he did not have a sign in his yard and did not support Tellef. Unlike the meeting with Helblig, Abbett is not alleged to have told Cochran that he would not be hired. However, the fact that Cochran's meeting with Abbett was similar and close in time with that alleged to have taken place between Helblig and Abbett—when Abbett told Helblig he was would not be hired because of his support for Tellef—makes it reasonable to infer that Abbett's decision not to hire Cochran was similarly motivated.

      The inference that Helblig and Cochran were not hired or recalled in retaliation for their political activities is supported by other circumstantial evidence. Abbett stated that he expected city employees to support his re-election and that he thought that Cochran and Helblig supported Tellef. Neither Helblig or Cochran supported Abbett's reelection. The fact that, eighteen months after the primary, Abbett asked both Cochran and Helblig why they wanted to work for the city under his administration when they supported Tellef suggests the Plaintiffs' failure to support his candidacy was still on his mind. Also, a reasonable juror could find it unusual that eighteen months after the election, out of the city's 175 workers, Abbett still remembered that these two employees did not support his candidacy. Abbett stated that he intentionally waited for the recall period to expire, and within days of the expiration, hired three workers with no experience for positions similar to those from which Helblig and Cochran had been laid-off. Taken together with Abbett's alleged statements to Helblig that he should not have bitten the hand that fed him and that Helblig would never work in the street department again, the totality of the evidence would allow a reasonable juror to

11

conclude Abbett retaliated against Cochran and Helblig. Thus, there is a material issue of fact for trial as to whether Abbett's decision not to hire or recall Helblig and Cochran was motivated by their protected political activities.

The Defendants argue unpersuasively that there is no material issue of fact as to Abbett's motivations for not hiring or recalling Helblig and Cochran. First, they cite *Robin v. ESPO Engineering, Corp.*, 200 F.3d 1081, 1088–89 (7th Cir. 2000), as supporting their argument. The facts in *Robin* suggesting an impermissible motivation were much weaker than the evidence presented here. In *Robin*, the plaintiff employee was let go for poor performance. He claimed his termination was motivated by his age, religion, and disability. In support, he offered evidence that two years before his termination, his employer referred to him as an "old S.O.B." and that he was "getting too old." *Id.* at 1089. Also, his employer had said that he could not fire the plaintiff because he was sick and would get into trouble. *Id.* The Seventh Circuit found that for the comments to raise a material issue of fact as to the employer's motivations, the plaintiff "'must show that the remarks were related to the employment decision in question.'" *Id.* (quoting *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996)). Because the comments occurred two years before the employee was terminated, and were "made in the context of random office banter," they did not relate to the employment decision at issue. *Id.* ("'[C]onversational jabs in a social setting' do not constitute evidence of intent to fire for an impermissible reason."(quoting *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1122 (7th Cir. 1998))).

The Defendants attempt to characterize the comments allegedly made by Abbett when Cochran and Helblig came to apply for jobs as "office banter" or "conversational jabs," and claim that "[a]nyone would be surprised that the losers in the political arena would actively seek a job from

12

the winners." (Def. Reply Br. 6, DE 65.) However, other reasonable interpretations of Abbett's comments are possible. Taking all inferences to favor the Plaintiffs, Abbett's comments to Helblig, as he was applying for a job—"don't bite the hand that feeds you" and "[y]ou'll never work in the street department again"—were not "conversational jabs" unconnected to the adverse employment decision, but statements of Abbett's intent to keep Helblig from coming back to work for the city because he supported Tellef. It is direct evidence of Abbett's motivation for not hiring Helblig to work in the street department, and strong circumstantial evidence of why Cochran was not hired back to his old job in the water plant. Also, a reasonable juror could disagree with Defendants' assertion that "[a]nyone would be surprised that the losers in the political arena would actively seek a job from the winners." Rather, a reasonable juror could find it surprising that the Mayor would inquire about the political affiliations of those working in the street department and water plant.

The Defendants also rely on *Roger Whitmore's Automotive Services, Inc. v. Lake County*, 424 F.3d 659 (7th Cir. 2005). In that case, the plaintiff alleged that he lost towing business because he supported the losing candidate in a sheriff's election in April 1998. He had little evidence to support his claim. He relied on the timing of the sheriff's department's change to its towing plan in April 1999, arguing that his loss of territory could only have come as retaliation for supporting the sheriff's opponent in early 1998. *Id.* at 669. The plaintiff also offered as evidence a conversation he had with an employee in the sheriff's office before the election. He informed the employee he would not be supporting the sheriff, and the sheriff's department employee expressed disappointment. The Seventh Circuit held that the plaintiff's evidence was insufficient to create a material issue of fact as to the sheriff's motivation for changing the towing plan. *Id.*

In this case, the Plaintiffs have offered more substantial evidence to connect their protected

13

conduct to the adverse decision than the plaintiff in *Roger Whitmore's*. This case is not like *Roger Whitmore's* in that the length of time between the protected speech and the alleged retaliation weakens the reasonableness of inferring an impermissible motivation. In this case, Abbett raised the issue of the Plaintiffs' political activities eighteen months after the primary, making reasonable the inference that Abbett continued to be motivated by the Plaintiffs' protected conduct. Also, Abbett's comments were made while the Plaintiffs were applying to be rehired, further bolstering the inference of a retaliatory motive. Finally, Abbett allegedly told Helblig his support for Tellef would mean he would never work for the street department again, and the plaintiff in *Roger Whitmore's* had no such direct evidence of the sheriff's motivations. The Defendants' comparison of the evidence in this case to that in *Roger Whitmore's* is not convincing.

b.     *Whether the Defendants Would Have Taken the Same Action in the Absence of the Plaintiffs' Protected Political Activities*

Because the Plaintiffs have shown that a material issue of fact exists as to whether the city's failure to hire or recall them was motivated by their protected political activities, the burden moves to the Defendants to demonstrate by a preponderance of the evidence that they would have reached the same decision even in the absence of the Plaintiffs' protected speech. *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416 (1979).

The Defendants claim that the decision to terminate the Plaintiffs and the other employees was motivated by a desire to cut costs. This is uncontested, but the adverse employment decision at issue is not the initial decision to terminate the Plaintiffs, but the failure of the city to rehire or recall them when positions opened. The Defendants argue the decision not to recall the Plaintiffs did not violate the Teamster contract, but this does not suggest that the Defendants would still have

14

refused to recall the Plaintiffs had they not supported Tellef. Whether the Teamster contract was violated is not at issue. Finally, the Defendants argue that the Plaintiffs were low on the seniority list and had the city recalled laid-off employees, the Plaintiffs still would not have been able to come back to work for the city. However, this ignores the fact that the other laid-off workers could refuse to be recalled, and the fact that the Plaintiffs could have been rehired even after their recall rights expired.

The evidence shows there is a material issue of fact whether the Plaintiffs would have been recalled or rehired independent of their political activities. Abbett stated that he intentionally waited until after the expiration of the recall period to fill open union positions. The Plaintiffs' recall rights expired on November 6, 2004, and three employees with no experience were hired for union jobs in the next nine days. When asked why he did not recall or rehire the Plaintiffs if he needed employees, he stated the contract did not require him to hire them back and that he had no reason for not rehiring or recalling them.

The Defendants have failed to carry their burden to show that they would not have hired the Plaintiffs apart from their political activities.

### D.    Conclusion

The Court is not permitted to make judgments about the credibility and truthfulness of any witness, and makes no determination about which version of the facts is correct. The evidence presented by the Plaintiffs is sufficient to create a material issue of fact as to whether Abbett decided not to hire or recall Cochran and Helblig because they engaged in conduct protected by the First

Amendment, and as to whether Abbett would have hired or recalled them but for their protected conduct. These determinations are for a jury to make at trial. Therefore, summary judgment is denied.

**ORDER**

The Defendants' motion for summary judgment [DE 52] is DENIED. A telephone conference is SET for Thursday, October 5, 2006 at 10:00 AM before Judge Theresa L. Springmann to schedule a trial date. The Court will initiate the call.

SO ORDERED on September 29th 2006.

S/ Theresa L. Springmann<br>
THERESA L. SPRINGMANN, JUDGE<br>
UNITED STATES DISTRICT COURT